UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES BAFFORD, doing
business as CAR DOCTOR,

        Plaintiff,

    v.

TRAVELERS CASUALTY
INSURANCE COMPANY OF
AMERICA, a Connecticut
corporation, qualified to
do business in California,

        Defendants.

_____/

NO. CIV. S-11-2474 LKK/JFM

O R D E R

    Plaintiff James Bafford has sued defendant Travelers Casualty Insurance Company of America, alleging (i) breach of contract, and (ii) breach of the covenant of good faith and fair dealing.

    Travelers insured Bafford under a general business insurance policy that covered both property theft and loss of income. Bafford alleges that, after his business was burglarized, Travelers breached the contract by refusing to pay his claim, and breached the covenant of good faith and fair dealing both by failing to conduct a proper investigation, and by unreasonably delaying

1

payment on his claim. He filed suit in San Joaquin County Superior Court on July 20, 2011. The case was removed to this court on September 16, 2011. Travelers refused payment on the claim on February 2, 2012.

Travelers moves for partial summary judgment on the issues of whether it can be held liable to Bafford for (i) breach of the implied covenant of good faith and fair dealing, and (ii) punitive damages.

The motion came on for hearing on November 5, 2012. Travelers was represented at the hearing by its attorneys of record, G. Edward Rudloff, Jr. and Jennifer N. Wahlgren; Bafford's attorney failed to appear.

Having considered the matter, for the reasons set forth below, the court will (i) deny Travelers' motion for partial summary judgment on Bafford's claim for breach of the implied covenant of good faith and fair dealing, (ii) grant Travelers' motion for partial summary judgment on Bafford's claim for punitive damages, and (iii) order Bafford's counsel to show cause why he should not be sanctioned for his failure to appear at the hearing on the instant motion.

**I. FACTS**

The following facts are undisputed or sufficiently uncontroverted. Travelers issued Bafford d/b/a "Car Doctor" a policy to insure property at his auto repair shop in Lodi, California. (Defendant's Statement of Undisputed Facts ("DSUF"), ECF no. 17-4, 1 & 2.) The policy's effective dates were October 26,

1   2010 to October 26, 2011. (DSUF 1.)

2       On March 25, 2011, Bafford reported to Travelers that his shop

3   had been burglarized, and his tools stolen (the "Loss"). (DSUF 2.)

4   Bafford's claim was recorded in Travelers' notes and assigned claim

5   number ENR1882 ("Claim"). (Id.)

6       According to Travelers' notes, Bafford's building had an

7   alarm, but it was not set before the Loss occurred. (DSUF 17.)

8   Travelers' notes also state that the digital video recorder for

9   Bafford's surveillance camera was stolen. (Id.)

10      Beginning on or about March 26, 2011, Travelers requested

11  documentation of the Loss from Bafford, including receipts,

12  itemization of tools stolen, bank statements, work orders, and

13  other information. (Plaintiff's Statement of Undisputed Facts

14  ("PSUF"), ECF no. 28-2, 3.)[1]

15      On March 30, 2011, Bafford's Claim was transferred to claim

16  professional Gerald Guilles. (DSUF 19.)

17      On April 1, 2011, Travelers' investigator ExZelda Vernon

18  visited Bafford's place of business and took a recorded statement

19  from him. (PSUF 4; DSUF 22.) Bafford advised Vernon that the day

20  before the burglary, a representative from a company called All

21  Data came to his business as he was preparing to leave. (PSUF 12.)

22  _____

23      [1] Travelers disputes the degree to which Bafford complied with
    this request. (Travelers' Response to Plaintiff's Separate
24  Statement of Additional Facts ("Traveler's Response to PSUF"), ECF
    no. 30-2, at 3; Travelers' Objections to Plaintiff's Evidence
25  ("Travelers' Objections"), ECF no. 30-3, at 5.) Even if Travelers'
    dispute is well-taken, the court's decision herein does not turn
26  on Bafford's compliance with the request.

1  At the time, Bafford was in a hurry to get to a service call for
2  DirectTV. Bafford apologized to the representative, and told him
3  he would have to reschedule the appointment. In his haste to leave,
4  he forgot to set his alarm. (Affidavit of James Bafford, ECF no.
5  28-4, ¶ 11.) In her deposition, Vernon acknowledged that Bafford
6  told her this story. (Affidavit of Thomas J. Newton, ECF no. 28-5,
7  Exhibit G.) Vernon later confirmed with All Data that one of its
8  representatives was at Bafford's premises the day before the
9  burglary, but did not include this fact in her investigative
10  report. (PSUF 12-14.)

11     According to Travelers' notes, Vernon also canvassed the
12  neighborhood around Bafford's business on April 1, 2011. (DSUF 25.)

13     On April 4, 2011, Vernon received a phone call from an
14  anonymous individual. (PSUF 6.) Vernon's notes from this date
15  state, in pertinent part:

16     •    Received a voicemail message from one of the businesses
17          that I met on Friday regarding Bafford shop. He asked me
18          to call, but stated he did not want to be identified....

19     •    The witness told me that 3-4 days prior to the theft, he
20          and his office manager whose desk faces the shop saw
21          Bafford moving things (shop equipment) out of his shop
22          and loading them into a trailer. The witness told me
23          that he saw Bafford put a compressor, steam cleaner and
24          other tools into the trailer as if he was closing up
25          shop....

26     •    Witness stated...he saw Bafford unlock the gate and walk

1    into the shop. Witness said Bafford was very calm and
2    collective [*sic*], not upset like someone had just robbed
3    the place....

4    •    Witness told me Bafford does not get a lot of customers.
5         Witness told me that Bafford did have the postal
6         account, but he believes he lost the account because he
7         saw the post office tow two of their trucks away from
8         the shop 2-3 weeks ago on a flat bed. Witness told me
9         that he believes Giant Tire Discount has the account
10        again, as Bafford under bid them to get it initially....

11   •    I advised witness that Bafford stated he makes $40,000
12        plus a month and he said that was impossible. Witness
13        stated that they get more customers than Bafford and
14        have regular customers and they do not make that much
15        money a month....

16   •    Witness said they saw Bafford make at least 2 trips with
17        the trailer and green truck from the shop....

18   •    Witness believes Bafford is hiding his tools somewhere.
19   (DSUF 28.)

20        That same day, investigator Vernon called claim professional
21   Guilles to advise him of her conversation with the anonymous
22   witness. (PSUF 9.) The witness was later identified as one Dennis
23   Bloom.

24        On April 4, 2011, Guilles sent Vernon an email stating: "im
25   going to meet with [Bafford]. he said he cant in the afternoon had
26   to go to stockton probably where he is hiding the goodies." [*sic*.]

5

1  Vernon responded: "Probably!" (PSUF 10; Newton Affidavit, ECF no.
2  28-5, Exhibit E.)

3      On April 15, 2011, Guilles sent Bafford a letter, on
4  Travelers' letterhead, reserving its rights under the insurance
5  policy and the law, and requesting a sworn statement of proof of
6  loss. (DSUF 34.) On May 4, 2011, Travelers received Bafford's sworn
7  statement of proof of loss. (DSUF 36.)

8      On May 5, 2011, Bafford's file with Travelers was transferred
9  to claim professional Ryan Sigel. (DSUF 37.) At some point in time,
10 Bafford advised either Guilles or Sigel that if he was unable to
11 replace the tools or diagnostic equipment that were allegedly
12 stolen, he would be forced to close his business. (PSUF 5.)

13     On May 9, 2011, Sigel made a note stating, in pertinent part,
14 "ExZelda [Vernon] advised that she will try again to contact the
15 witness but advised that she can't force him to provide a
16 statement. I advised that we don't have much ground to stand on
17 without it." (Newton Affidavit, ECF no. 28-5, Exhibit R; referenced
18 in PSUF 24.)[2]

19     Travelers' employees also sent the following internal
20 communications:

21     •   On April 5, 2011, Guilles sent Vernon an email that
22       reads in pertinent part: "Yeah definitely this guys

23

---

24     [2] Travelers disputes Bafford's statement in this undisputed
   fact that these notes "indicate that Travelers was aware that
25 without the statement of the anonymous witness, they did not have
   much ground to stand on." The court does not rely on this portion
26 of the undisputed fact herein.

1          [*sic*] is a liar.  I really don't buy force entry on the

2          door.  He showed me a bunch of receipts of his equipment

3          etc  and  looked  like  he  prepared  It  [*sic*]  well  and

4          prepared for a while.  Guy was not looking me in the eye

5          and  he  was  nervous."  (DSUF  30.)  Vernon  responded,  "I

6          know! Did you see how empty his shop is?" (Id.)

7     •    An email from Guille to Vernon, dated April 18, 2011,

8          stating:  "I  don't  feel  pressured.  I  just  hope  this

9          witness talks because I want to nail this as much as you

10         do."

11    •    An  email  from  Sigel  to  Vernon,  dated  May  17,  2011,

12         stating, "It would be nice to nail that guy."

13    •    An email from Vernon to Sigel, on May 23, 2011, stating,

14         "I just want to get this guy."

15   (Newton  Affidavit,  ECF  no.  28-5,  Exhibit  S;  referenced  in  PSUF

16   25.)[3]

17        On May 20, 2011, Sigel sent Bafford's attorney, Thomas J.

18   Newton,  a  letter,  on  Travelers'  letterhead,  rejecting  Bafford's

19   sworn statement of proof of loss. (DSUF 38.)

20        On June 21, 2011, investigator Vernon obtained a recorded

21   statement from witness Bloom. (DSUF 39.) In his statement, Bloom

22   said:

23    •    Two to three days prior to [Bafford] reporting it as a

24   _____

25        [3] Travelers disputes Bafford's allegation, in this undisputed
     fact, that these emails "indicate malice on [Travelers' employees']
     part towards [Bafford's] claim." The court does not rely on this
26   allegation herein.

burglary, myself and...my co-worker who observed him moving several items out of the building....

- We saw him removing an air compressor, miscellaneous tools and equipment....

- And again, we saw miscellaneous tools, it's kind of hard to tell exactly what type of tool they were, but it looked as if he was, like, moving out....

- Not only was he moving things into a large white van that he, he considered his service van, but a flat-bed trailer, and his [*sic*] he has a green early model, or earlier model Chevrolet pickup....

- It was two or three days of him each day, making about, like, one or two runs of moving things out....

- It was...three or four hours between trips, so wherever he was taking 'em then I guess you gotta account for unloading the items. Two or three hours, I would say, between each trip.

(DSUF 41.)

Bloom made two other statements that Travelers relies on in its motion:

- [Bafford's building] was definitely shut [on March 25, 2011]...when I saw him come up, it looked to me, like, he was unlocking the lock...to open the gate. (DSUF 43.)[4]

---

[4] There is a dispute between Bafford and Travelers as to whether he has been consistent in claiming that the chain, rather than the lock, securing his business was cut. (DSUF 21, DSUF 65, PSUF 4.)

8

1     •    And he said he could...he was pretty happy with the fact

2              that he could monitor [his surveillance system] from

3              home and so on. . . . That's what he said, he, he,

4              pretty much bragged about that.  Because he...his idea

5              was that he was going to be big enough to where he

6              didn't have to be there. He, he would monitor his

7              employees from home.

8 (DSUF 45.)

9     On September 2, 2011, investigator Vernon obtained a recorded

10 statement from Bloom's colleague, Patricia Garcia. (DSUF 58.)

11 Garcia stated that she saw Bafford loading equipment into a pickup

12 and a flatbed trailer, and that he made "two or three trips." (DSUF

13 59-61.)

14     On February 2, 2012, Travelers sent attorney Newton a letter

15 denying Bafford's claim, on the grounds that he had made material

16 misrepresentations during the investigation and while being

17 examined under oath. (DSUF 75.)

18     According to Bafford, no Travelers representative ever

19 informed him that witnesses had seen him moving equipment out of

20 his business two to three days before the burglary. Bafford only

21 learned of Bloom's statement when he obtained it in discovery.

22 (Bafford Affidavit, ECF no. 28-4, ¶¶ 7-8).[5]

23 ───────────────

24     [5] Defendant lodged a copy of Vernon's complete deposition
transcript with the court. In it, Vernon confirms that she did not

25 tell Bafford about Bloom, and never gave him an opportunity to
explain Bloom's or Garcia's statements. (Deposition of ExZelda

26 Vernon, 73:7-21.)

1    On March 23, 2011, two days before the Loss, Bafford and one

2    Ignacio Cachu took a load of old parts, scrap metal and other

3    miscellaneous items to both Lodi Recycling Center and Stockton

4    Recycling Center for disposal and redemption. (PSUF 15.)[6] Travelers

5    took Cachu's deposition on June 21, 2012. (Newton Affidavit, ECF

6    no. 28-5, ¶ 14.)

7    According to Bafford, after visiting the Lodi Recycling

8    Center, he and Cachu returned to Bafford's business and then

9    departed to the Stockton Recycling Center. (James Affidavit, ECF

10   no. 28-4, ¶ 8.) Bafford claims he obtained receipts and videotape

11   pictures from the Stockton Recycling Center that show delivery of

12   approximately 2000 lbs. of metal, including an air compressor tank,

13   on March 23, 2011. (Bafford Affidavit, ECF no. 28-4, ¶ 9.)

14   **II. STANDARDS**

15   **A.    Summary Judgment.**

16   Summary judgment is appropriate "if the movant shows that

17   there is no genuine dispute as to any material fact and the movant

18   is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

19   Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677 (2009)

20   (it is the movant's burden "to demonstrate that there is 'no

21   genuine issue as to any material fact' and that they are 'entitled

22   to judgment as a matter of law'"); Walls v. Central Contra Costa

23   Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (same).

24   Consequently, "[s]ummary judgment must be denied" if the court

25   ────────────

26       [6] Travelers objects to this fact on the grounds of relevance.
     As discussed herein, this objection is unfounded.

1   "determines that a 'genuine dispute as to [a] material fact'
2   precludes immediate entry of judgment as a matter of law." Ortiz
3   v. Jordan, 562 U.S. __, 131 S. Ct. 884, 891 (2011), quoting Fed.
4   R. Civ. P. 56(a); Comite de Jornaleros de Redondo Beach v. City of
5   Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (same).

6       Under summary judgment practice, the moving party bears the
7   initial responsibility of informing the district court of the basis
8   for its motion, and "citing to particular parts of the materials
9   in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact
10  cannot be ... disputed." Fed. R. Civ. P. 56(c)(1); In re Oracle
11  Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010)
12  ("The moving party initially bears the burden of proving the
13  absence of a genuine issue of material fact"), citing Celotex v.
14  Catrett, 477 U.S. 317, 323 (1986).

15      A wrinkle arises when the non-moving party will bear the
16  burden of proof at trial. In that case, "the moving party need only
17  prove that there is an absence of evidence to support the non-
18  moving party's case." Oracle Corp., 627 F.3d at 387.

19      If the moving party meets its initial responsibility, the
20  burden then shifts to the non-moving party to establish the
21  existence of a genuine issue of material fact. Matsushita Elec.
22  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);
23  Oracle Corp., 627 F.3d at 387 (where the moving party meets its
24  burden, "the burden then shifts to the non-moving party to
25  designate specific facts demonstrating the existence of genuine
26  issues for trial"). In doing so, the non-moving party may not rely

1  upon the denials of its pleadings, but must tender evidence of
2  specific facts in the form of affidavits and/or other admissible
3  materials in support of its contention that the dispute exists.
4  Fed. R. Civ. P. 56(c)(1)(A).

5      "In evaluating the evidence to determine whether there is a
6  genuine issue of fact," the court draws "all reasonable inferences
7  supported by the evidence in favor of the non-moving party." <u>Walls</u>,
8  65.3 F.3d at 966. Because the court only considers inferences
9  "supported by the evidence," it is the non-moving party's
10 obligation to produce a factual predicate as a basis for such
11 inferences. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 810 F.2d 898,
12 902 (9th Cir. 1987). The opposing party "must do more than simply
13 show that there is some metaphysical doubt as to the material
14 facts.... Where the record taken as a whole could not lead a
15 rational trier of fact to find for the nonmoving party, there is
16 no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 586-87
17 (citations omitted).

18 **B.   Bad Faith**

19     In every insurance policy, there is an implied covenant of
20 good faith and fair dealing that neither the insurer nor the
21 insured "will do anything which will injure the right of the other
22 to receive the benefits of the agreement." <u>Comunale v. Traders &</u>
23 <u>General Ins. Co.</u>, 50 Cal.2d 654, 658, 659 (1958).

24     This covenant assumes "peculiar importance in insurance law
25 because it may support the recovery of a tort measure of damages."
26 <u>Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.</u>

1   78 Cal.App.4th 847, 880 (2000) (citing Comunale, 50 Cal.2d. at

2   658.) By contrast, an insurer that denies benefits incorrectly, but

3   without breaching the covenant, is liable only for damages flowing

4   from the breach of contract——that is, the policy benefits. Morris

5   v. Paul Revere Life Ins. Co., 109 Cal.App.4th 966, 977 (2003).

6        "[A]n insurer's breach of the implied covenant of good faith

7   and fair dealing constitutes what is commonly called 'bad faith.'"

8   Archdale v. American Internat. Specialty Lines Ins. Co. 154

9   Cal.App.4th 449, 466 (2007). "An insurer is said to act in 'bad

10  faith' when it not only breaches its policy contract but also

11  breaches its implied covenant to deal fairly and in good faith with

12  its insured." Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062,

13  1071 (2007).

14       To establish bad faith, an insured party must show that

15  (1) benefits due under the insurance policy were withheld; and

16  (2) the insurer's reason for withholding benefits was either

17  unreasonable or without proper cause. Love v. Fire Insurance

18  Exchange, 221 Cal.App.3d 1136, 1151 (1990).

19       Whether an insurer has withheld benefits "reasonably" is an

20  objective inquiry that focuses on the insurer's conduct, not a

21  subjective inquiry into the insurer's good or bad intentions.

22  Bosetti v. U.S. Life Ins. Co. in the City of New York, 175

23  Cal.App.4th 1208 (2009). As the California Supreme Court has

24  recognized:

25           The terms of "good faith" and "bad faith," as used in
             this context...are not meant to connote the absence or
26           presence of positive misconduct of a malicious or

immoral nature considerations which, as we shall indicate below, are more properly concerned in the determination of liability for punitive damages....

[T]he phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes (from consideration) a variety of types of conduct characterized (in other contexts) as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.

Neal v. Farmers Ins. Exchange, 21 Cal.3d 910, 921 n.5 (1978) (internal quotations and citations omitted).

Therefore, "an insured plaintiff need only show, for example, that the insurer unreasonably refused to pay benefits....there is no requirement to [also] establish subjective bad faith." Bosetti, 175 Cal.App.4th at 1236. Nevertheless, the insurer's subjective mental state may be relevant to the question of reasonableness; for example, the insurer's knowledge that it may have set aside inadequate reserves to pay a claim could be considered as evidence of its objective unreasonableness in refusing to pay. Id.

The ultimate standard is as follows: "If an insurer is to avoid liability for bad faith, its actions and position with respect to the claim of an insured, and the delay or denial of policy benefits, must be founded on a basis that is reasonable under all the circumstances." Bosetti, 175 Cal.App.4th at 1237 (internal quotations omitted).

One form of objectively unreasonable conduct is failure to fully investigate the grounds for denial. To fulfill its

14

obligations, an insurer must give "at least as much consideration to the interests of the insured as it gives to its own interests.... And an insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial." Frommoethelydo v. Fire Ins. Exchange, 42 Cal.3d 208, 214-215 (1986). "An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing." Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th 1617, 1624 (1996) (affirming finding of bad faith under accidental death policy where insurance company failed to consider evidence that insured's death was due to automobile accident, rather than illness).

One court has elaborated on the standard for a thorough investigation as follows:

> An unreasonable failure to investigate amounting to. . . unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages....
> ....
> The insurer's willingness to reconsider its denial of coverage and to continue an investigation into a claim has been held to weigh in favor of its good faith.

Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. 78 Cal.App.4th 847, 880 (2000). An insurer's efforts to seek more information from several sources and reconsider plaintiff's claims at various times has been held to demonstrate good faith; conversely, an insurer's "early closure of investigation and unwillingness to reconsider a denial when presented with evidence

15

1 of factual errors will fortify a finding of bad faith." <u>Id.</u> (<u>citing</u>

2 <u>Austero v. National Cas. Co.</u> 84 Cal.App.3d 1 (1978), <u>reversed on</u>

3 <u>other grounds in</u> <u>Egan v. Mutual of Omaha</u>, 24 Cal.3d 809 (1979)).

4     Ultimately, "whether an insurer breached its duty to

5 investigate [is] a question of fact to be determined by the

6 particular circumstances of each case." <u>Paulfrey v. Blue Chip</u>

7 <u>Stamps</u> (1983) 150 Cal.App.3d 187, 196.

8 **III. ANALYSIS**

9 **A. Evidentiary Issues**

10     "In general, only admissible evidence may properly be

11 considered by a trial court in granting summary judgment."

12 <u>Hollingsworth Solderless Terminal Co. v. Turley</u>, 622 F.2d 1324,

13 1335 n.9 (9th Cir. 1980). The court will therefore address the

14 parties' evidentiary objections before ruling on the motion itself.

15     **1. Bafford's evidentiary objections**

16     Travelers' statement of undisputed facts, facts nos. 3-7,

17 describe the National Insurance Crime Bureau ("NICB") and its work.

18 For example:

19     "[T]he NICB has developed objective criteria which can
be used by adjusters to review claims for possible
20     fraud. NICB indicators, or 'red flags,' help isolate
claims that merit closer scrutiny. No single indicator
21     by itself is necessarily suspicious. Even the presence
of several indicators, while suggestive of possible
22     fraud, does not automatically mean that a fraud has been
committed, although frequently that may be the case."
23     (DSUF 6.)

24 These facts are copied virtually verbatim from statements made by

25 claims investigator Vernon in an affidavit in support of this

26 motion. (ECF no. 20.)

16

Travelers' statement of undisputed facts also sets out nine of NICB's "red flags," *e.g.*, "The NICB provides an indicator of property fraud is: 'Insured is overly pushy for a quick settlement.'" (DSUF 14.) These red flags are copied verbatim from a document entitled "Indicators of Property Fraud," apparently promulgated by the NICB, attached as Exhibit A to Vernon's affidavit. (ECF no. 20.)

Bafford first objects to the undisputed facts that describe the NICB on the grounds that "citation to the work of the NICB is not properly presented through the affidavit of the lay person." (Plaintiff's Objections to Defendant's Evidence, ECF no. 28-3.) This objection is not well-taken. Vernon is not testifying as to her opinion, or matters of scientific, technical, or other specialized knowledge requiring expert testimony.(Fed. R. Evid. 702.) Rather, she is testifying about matters she learned during her training.

Bafford also objects to Travelers' undisputed facts, nos. 8-16, regarding the NICB "red flags" as inadmissible hearsay under Fed. R. Evid. 801. Travelers counters that the "red flags" are nonhearsay.

While Bafford's objection might stand at trial, it is insufficient to exclude the "red flags" document at summary judgment. It is sufficient that this document could be found admissible at trial if properly presented. See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support...a fact cannot be presented in a form that would be

admissible in evidence"); <u>see also</u> <u>Fraser v. Goodale</u>, 342 F.3d 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.") Here, Vernon could conceivably recite the "red flags" that she relies upon in conducting an investigation from her personal knowledge, Fed. R. Evid. 602, and use this document to refresh her recollection. Fed. R. Evid. 612; <u>see also</u> <u>Fraser</u>, 342 F.3d at 1037.[7]

For these reasons, plaintiff's evidentiary objections are overruled.

**2. Travelers' evidentiary objections**

Travelers' evidentiary objections are of four types.

First, Travelers objects to a number of evidentiary items as irrelevant under Fed. R. Evid. 402 and 403. This objection is inapt in the summary judgment context. Fed. R. Civ. P. 56(a) directs the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact...." A material fact is one that might affect the outcome of the summary judgment motion. As noted by the Supreme Court:

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and

_____

[7] The court reserves a ruling on whether the NICB "red flags" are in fact red flags, that is, factors which would reasonably justify the withholding or denial of an insurance claim. It may be that this is a question for the jury at trial.

which facts are irrelevant that governs.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, when a party proffers a fact in support of, or in opposition to, a summary judgment motion, the court must identify whether the fact tends to establish a claim or defense under the applicable substantive law. While the court may consider Travelers' views on whether Bafford's evidence is material, it need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of issues, or any of the other grounds outlined in Fed. R. Evid. 403. Accordingly, the court will disregard Travelers' objections made on grounds of relevance, since these facts contain the necessary tendency.

Second, Travelers objects to a number of the statements in Bafford's affidavit, and certain facts in his statement of undisputed facts, because they assertedly misstate the underlying documentary evidence, are speculative, and/or are in the form of legal conclusions. For example, Bafford's twenty-fifth undisputed fact states, "Travelers' emails indicate malice on their [*sic*] part towards the claim of Plaintiff." This statement, rather than presenting an undisputed fact, asks the court to reach a legal conclusion, and has been disregarded accordingly. In deciding this motion, the court has been careful to verify the documentary and testimonial evidence underlying its analysis, and to disregard any speculative statements or legal conclusions masquerading as facts.

Third, Travelers objects to two statements as hearsay under Fed. R. Evid. 802. One is contained in Bafford's eighth undisputed

fact: "At the Lodi Recycling Center, were [*sic*] advised that a higher price for the materials could be obtained at the Stockton Recycling Center." This statement is not hearsay, as it is not being offered for the truth of the matter asserted (*i.e.*, the relative prices at the two recycling centers), but merely to show why Bafford went to Stockton. This objection is overruled.

The other statement disputed as hearsay is contained in Bafford's twenty-third undisputed fact, which quotes three emails sent by Travelers' personnel. These emails are quite obviously admissible, either as nonhearsay statements by an opposing party (Fed. R. Evid. 801(d)(2)), or as exceptions to the hearsay rule, either as statements of existing state of mind (Fed. R. Evid. 803(3)) or statements against interest (Fed. R. Evid. 804(b)(3)). The court will admit these statements into evidence for purposes of this motion.

Finally, Travelers objects to the admission of the deposition transcripts of Ignacio Cachu and Dennis Bloom because Bafford failed to file certifications of the respective court reporters with these transcripts. In other words, these transcripts have not been properly authenticated under Fed. R. Evid. 901. The court will order Bafford to file the relevant certifications in order to cure this defect. Note that under the recently-added Fed. R. Civ. P. 56(c)(2), a proponent of evidence need merely show that the objected-to evidence can be presented in a form that would be admissible at trial. According to the 2010 comment to this rule:

Subdivision (c)(2) provides that a party may object that

1       material cited to support or dispute a fact cannot be
        presented in a form that would be admissible in
2       evidence. The objection functions much as an objection
        at trial, adjusted for the pretrial setting. The burden
3       is on the proponent to show that the material is
        admissible as presented or to explain the admissible
4       form that is anticipated.

5  By filing the certifications, Bafford can demonstrate to the

6  court's satisfaction that the transcripts are "admissible as

7  presented."[8]

8       We will now turn to the substance of Travelers' motion.

9  **B. Motion for Partial Summary Judgment**

10      The court must decide this motion under California's

11  substantive law.  When the court sits in diversity, it must apply

12  the substantive law of the forum in which it is located. Erie R.R.

13  Co. v. Tompkins, 304 U.S. 64, 78 (1938). The parties have briefed

14  the issues under California law, and neither argues that the

15  insurance contract at the center of the dispute calls for the

16  application of the law of another forum.

17      **1. Has Travelers shown an absence of any evidence to support**

18      **Bafford's bad faith claim?**

19      Travelers moves for summary judgment on Bafford's claim of bad

20  faith. The initial burden is on Travelers to prove the absence of

21  a genuine issue of material fact. Oracle Corp., 627 F.3d at 387.

22  When the non-moving party will bear the burden of proof as to a

23  ────────────

24       [8] Indeed, since Travelers does not claim the depositions are
     not what they purport to be, it appears that it is unreasonably
     requiring an unnecessary multiplication of proceedings, which, of
25   course, is sanctionable conduct.  The court will restrain an
     imposition of sanctions at this time. However, counsel is
26   cautioned as to such conduct.

claim at trial, the moving party "need only prove that there is an absence of evidence to support the non-moving party's case." <u>Id.</u> At trial, Bafford, the non-moving party, will bear the burden of proving Travelers' bad faith. Therefore, Travelers must show an absence of evidence to support Bafford's bad faith cause of action.

Travelers argues that it promptly and thoroughly investigated Bafford's claim, and having done so, reached a reasonable determination that the claim was not covered by Bafford's insurance policy. It points to the following:

- The alleged timeliness and thoroughness of its investigation, which included inspections of Bafford's business premises; interviews of neighboring businesses; requests for documentation supporting Bafford's claimed losses; discussions with the Lodi Police Department; obtaining witness statements; running a background check on third-party witness Dennis Bloom; following up with businesses mentioned in Bafford's and Bloom's statements; and conducting an examination under oath of Bafford.

- Alleged misrepresentations by Bafford during his examination under oath: he claimed that his stolen tools were in his shop for 5 days before the Loss (while witnesses Bloom and Garcia observed him removing tools and equipment shortly before the Loss) (DSUF 28, 41, 59, 64); he denied using a flatbed truck in his business, or borrowing a flatbed or trailer (while Bloom and Garcia

observed him loading a flatbed trailer on March 23, 2011) (DSUF 44, 59, 67, 68; PSUF 21); he said that the chain to his business had been cut when he discovered the Loss (but had previously indicated to Vernon that the lock has been cut) (DSUF 21, 65); he claimed that the gate to his business was closed when he arrived on the morning of the Loss (but according to the relevant police report, he had found the gate open) (DSUF 52, 66); and he denied that could monitor his surveillance system from home (but according to Bloom, had earlier bragged about being able to do so) (DSUF 45, 69).

- Alleged NICB "red flag" indicators triggering suspicions of fraud, such as losses of a large amount of cash (DSUF 9, 22, 23); Bafford's provision of receipts for inexpensive items, but not items of significant value (DSUF 12, 24, 36); and claimed losses apparently incompatible with Bafford's income (DSUF 16, 71, 72).[9]

Travelers has failed to meet its burden on Bafford's bad faith claim. There are genuine issues for trial, as the record, taken as a whole, could "lead a rational trier of fact to find for

---

[9] Travelers cites <u>Osajindu v. Allstate Ins. Co.</u>, 2000 WL 342674 at *9 (N.D.Cal. March 27, 2000) (granting summary judgment in favor of insurer on bad faith claim) in support of its reliance on the NICB red flag indicators. But while the <u>Osajindu</u> court refers to generic "red flags" in the plaintiff's claims, the only reference to the NICB is to the organization's database showing members of insurance fraud rings. Therefore, this case does not provide authority for relying on the NICB "red flag" indicators in evaluating Travelers' good faith.

[Bafford]...." <u>Matsushita</u>, 475 U.S. at 586-7.    Specifically, the duty of good faith required Travelers to fully investigate Bafford's claim before denying it. <u>Frommoethelydo</u>, 42 Cal.3d at 214-215. The evidence in the record suggests that Travelers may have failed to do so.

Travelers relied heavily on Bloom's, and later, Garcia's, statements in reaching the decision to deny. Many of the facts that Travelers claims that Bafford misrepresented had their roots in the witnesses' observations — in particular, their reports of what they observed him moving from his business a few days before the Loss. Bafford claimed that his stolen tools were in his shop for 5 days before the Loss, while the witnesses saw him removing tools. (DSUF 28, 41, 59, 64.) Bafford denied using a flatbed truck in his business, or borrowing a flatbed or trailer, while the witnesses saw him loading a flatbed trailer. (DSUF 44, 59, 67, 68; PSUF 21.) But Travelers never gave Bafford a chance to explain what he was doing. "An unreasonable failure to investigate amounting to...unfair dealing may be found when an insurer fails to...seek to discover, evidence relevant to the issues of liability...." <u>Shade Foods</u>,78 Cal.App.4th at 880. Having obtained these observations from Bloom and Garcia, Travelers should have sought an explanation from Bafford. But there is no evidence that Travelers did so.

Travelers counters that Bafford failed to provide it with extenuating evidence while it was conducting its investigation, writing, "Although Travelers made multiple requests for documents

to support his claim, Plaintiff still had not produced all of the requested documents even after his [examination under oath]." (Reply, ECF no. 30, 8:8-9.) This is disingenuous. According to Bafford, Travelers neither informed him that Bloom had come forward nor told him what Bloom claimed to have seen him doing. Bafford only learned of Bloom's statement when he obtained it in discovery. Travelers cannot now argue that Bafford did not timely produce evidence about his pre-Loss activities, because he appears not to have known these were at issue when Travelers was conducting its investigation. One can reasonably infer that, in Bafford's mind, there was no connection between his having recycled scrap metal and equipment two days before the Loss, and Travelers' delay and ultimate denial of his claim. If he was unaware of Travelers' suspicions, how could he know that his March 23 recycling activities were more relevant than anything else he had done in the days prior to the burglary?

Moreover, there was nothing to prevent Travelers from re-opening its investigation once Bafford provided extenuating evidence. "The insurer's willingness to reconsider its denial of coverage and to continue an investigation into a claim has been held to weigh in favor of its good faith**."** <u>Shade Foods</u>, 78 Cal.App.4th at 880. Travelers has simply failed to show that it took into account Bafford's evidence that he transported equipment to the Lodi and Stockton Recycling Centers a few days before the loss, and the possibility that this is what Bloom and Vasquez observed him doing (rather than removing tools that he later

1  fraudulently claimed as stolen).

2      Travelers is also disingenuous in its reliance on California

3  insurance regulations as excusing its failure to give Bafford an

4  opportunity to rebut its version of events. It is true that, under

5  Cal.Code Regs. tit. 10, § 2695.7(c)(2), an insurer is not required

6  to disclose "any information that could reasonably be expected to

7  alert a claimant to the fact that the claim is being investigated

8  as a possible suspected fraudulent claim." The court recognizes

9  that a perpetrator of fraud might cover his tracks once alerted to

10  the possibility that he is being investigated for fraud. But

11  Travelers could have completed its initial investigation and then

12  sought Bafford's side of the story, or looked for disconfirming

13  evidence during the course of its investigation. Again, the court

14  can find no evidence that Travelers did either of these things.

15      Finally, the evidence suggests that Travelers concluded quite

16  early in the investigation that Bafford had submitted a fraudulent

17  claim and proceeded to seek information confirming that position.

18  An insurer's "early closure of investigation and unwillingness to

19  reconsider a denial when presented with evidence of factual errors

20  will fortify a finding of bad faith." <u>Shade Foods</u>, 78 Cal.App.4th

21  at 880. Bafford reported the Loss on March 25, 2011; just ten days

22  later, Guilles sent Vernon emails stating that Bafford was probably

23  "hiding the goodies" in Stockton and that he was "definitely...a

24  liar." Less than two months after the Loss, Sigel wrote Vernon

25  that, "It would be nice to nail that guy." A few days later, Vernon

26  responded, "I just want to get this guy." Perhaps most telling is

1   Sigel's May 9, 2011 note that "we don't have much ground to stand

2   on" without a statement from Bloom. It is reasonable to infer from

3   these statements that Travelers' investigators had made up their

4   minds that Bloom had submitted a fraudulent claim and were seeking

5   only confirming evidence.

6       In sum, there is evidence before the court suggesting that,

7   by neglecting to fully investigate what happened at Bafford's shop

8   on March 23, 2011, Travelers may have acted in an objectively

9   unreasonable fashion in handling Bafford's claim. Bosetti, 175

10  Cal.App.4th at 1208. As such, Travelers has failed to prove "an

11  absence of evidence to support [Bafford's] case." Oracle Corp., 627

12  F.3d at 387, and has not made a *prima facie* case for summary

13  judgment.

14      **2. The "genuine dispute" doctrine**

15      Travelers also asserts that it is entitled to summary judgment

16  under the "genuine dispute" doctrine: as it had a genuine dispute

17  with Bafford as to coverage, it did not act in bad faith by

18  delaying and then denying his claim. (Defendant's Memorandum of

19  Points and Authorities in Support of Motion for Partial Summary

20  Judgment, ECF no. 17-1, 11:15-27; Reply, ECF no. 30, 6:26-9:4.)

21      It is true that, under California law, a bad faith claim can

22  be dismissed on summary judgment if the defendant can show that

23  there was a genuine dispute as to coverage. Guebara v. Allstate Ins

24  Co. 237 F.3d 987, 991 (9th Cir. 2001). Specifically, a court can

25  conclude as a matter of law that an insurer's denial of a claim is

26  not unreasonable, "so long as there existed a genuine issue as to

the insurer's liability." Id. (quoting Lunsford v. American
Guarantee & Liability Ins. Co., 18 F.3d 653, 656 (9th Cir. 1994)).
Even "a mistaken or erroneous withholding of policy benefits, if
reasonable or if based on a legitimate dispute as to the insurer's
liability under California law, does not expose the insurer to bad
faith liability." It is merely a breach of contract. Chateau
Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co., 90
Cal.App.4th 335, 346-347 (Cal.Ct.App. 2001) (internal citations
omitted).

   Travelers' position nonetheless does not lie. The California
Supreme Court has made clear that "[t]he genuine dispute rule does
not relieve an insurer from its obligation to thoroughly and fairly
investigate, process and evaluate the insured's claim." Wilson v.
21st Century Ins. Co., 42 Cal.4th 713, 723. To constitute a genuine
dispute, the insurer's position must be maintained in good faith
and on reasonable grounds. Id. at 724. Moreover, the genuine
dispute doctrine does not change the standards for evaluating a
summary judgment motion. Id. As described above, there is evidence
that Travelers failed to adequately investigate Bafford's claim by
not giving him an opportunity to explain why he removed equipment
from his business two days before the alleged burglary. Travelers
has also failed to give a good faith explanation for this failure.
Accordingly, the court must conclude that, per Wilson, 42 Cal.4th
at 723, Travelers is not entitled to summary judgment under the
"genuine dispute" doctrine.

////

**3. Punitive damages**

Travelers also moves for partial summary judgment on whether it can be held liable for punitive damages. It presents three arguments in support of this position:

1. If the court grants Travelers summary judgment on Bafford's bad faith claim, that it must grant summary judgment on the punitive damages claim, since Bafford's punitive damages claim is wholly dependent on his bad faith claim.[10] See Jordan, 148 Cal.App.4th at 1073 ("[I]f the insurer denies benefits unreasonably...it may be exposed to the full array of tort remedies, including possible punitive damages.")

2. Bafford cannot put forth clear and convincing evidence that Travelers acted with the malice, oppression, or fraud required for an award of punitive damages under Cal. Civ. Code § 3294(a).

3. Bafford has failed to demonstrate that Travelers can be held liable for punitive damages based on the conduct of its employees under Cal. Civ. Code § 3294(b).

Travelers' first argument fails because the court has found in Bafford's favor on the bad faith claim. But Bafford has conceded that he lacks sufficient evidence to meet the standards outlined in Cal. Civ. Code §§ 3294(a) and (b), (ECF no. 34), and

---

[10] Under California law, punitive damages are not available on Bafford's breach of contract claim. See Frazier v. Metropolitan Life Ins. Co., 169 Cal.App.3d 90, 107 (1985).

1 accordingly, the court finds that Travelers cannot be held liable

2 for punitive damages in this action.

3 **V. CONCLUSION**

4     The court orders as follows:

5     [1] Defendant's motion for partial summary judgment on

6     plaintiff's claim for breach of the implied covenant of good

7     faith and fair dealing is DENIED without prejudice.

8     [2] Defendant's motion for partial summary judgment on

9     plaintiff's claim for punitive damages is GRANTED.

10     [3] Plaintiff shall FILE the court reporters' certifications

11     as to the authenticity of the deposition transcripts of

12     Ignacio Cachu and Dennis Bloom no less than fifteen (15) days

13     after entry of this order.

14     [4] Counsel for plaintiff, Thomas J. Newton, is Ordered to

15     Show Cause as to why he should not be sanctioned for his

16     failure to appear at the hearing on this motion in an amount

17     equal to the attorney's fees and costs incurred by defendant

18     in having its attorney, G. Edward Rudloff, Jr., appear.

19     Mr. Newton shall file a response to the Order to Show Cause

20     no later than ten (10) days from the date of this order. If

21     Mr. Newton does not oppose the Order to Show Cause, he shall

22     file a Statement of Non-Opposition no later than ten (10)

23     days from the date of this order.

24     [5] Counsel for Travelers shall file an affidavit of charges

25       incurred by his client by virtue of his appearance, no

26       later than seven (7) days from the date of this order.

1    IT IS SO ORDERED.

2    DATED:   November 7, 2012.

3

4

5

6    LAWRENCE K. KARLTON
     SENIOR JUDGE

7    UNITED STATES DISTRICT COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26